IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

| | |
|---|---|
| ASTORNET TECHNOLOGIES, INC. )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>BAE SYSTEMS INC. )<br>)<br>Defendant. ) | Civil Action No. 14-cv-00245<br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Astornet Technologies Inc. ("Astornet") files this First Amended Complaint against Defendant BAE Systems, Inc. ("BAE"), based upon actual knowledge as to itself and its own actions, and on information and belief as to all other persons and events, as follows:

**Parties**

1. Astornet is a Maryland Corporation with its principal place of business in Gaithersburg, MD. Astornet is the sole exclusive licensee of, and owns all right, title, and interest to litigate in this matter U.S. Pat. No. 7,639,844 (the '844 patent), referred to below as the '844 Patent.

2. BAE is a Delaware corporation, with its principal place of business at 1101 Wilson Boulevard, Suite 2000, Arlington, Virginia, 22209. BAE engages in the development, manufacture and distribution of products and services for U.S. air, land and naval forces, as well as security solutions. BAE may be served with process by service on its registered agent for service, the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

**Jurisdiction and Venue**

3. This claim arises under the United States patent laws, 35 U.S.C. § 1, *et seq*. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4. BAE has transacted business in Maryland, and has caused tortious injury in Maryland by an act or omission outside Maryland and derived substantial revenue from its activities in Maryland by establishing multiple BAE offices and/or facilities in Maryland, including establishing (1) BAE's Support Solutions Headquarters in Rockville, Maryland, (2) BAE's Intelligence & Security in Annapolis Junction, Maryland, and (3) BAE'S Intelligence & Security at two locations in Columbia, Maryland.

5. Venue is proper in this District and Division, under 28 U.S.C. §§ 1391 and 1400. BAE resides within this District.

**Factual Background**

6. Astornet is committed to providing the highest quality of customized products and services that meet the needs of government organizations and corporations. (Ex. 1 at 1). Astornet provides a full range of technology systems and services including software solutions, consulting and system integration. (*Id*. at 2). Astornet's customers include the Federal Aviation Administration, BWI Marshall Airport, the Maryland Department of Education, and the United States Department of Transportation. (*Id*.).

7. BWI in particular retained Astornet in late 2007 to meet new Transportation Security Administration ("TSA") requirements to improve security at the gates, (*id.* at 3), and in particular, develop a system to increase security while maintaining

an efficient entry/exit process, (*id.*). For this project, the Astornet team created a touch screen solution that was able to verify credentials authenticity, perform an instant security check for all persons entering the airport, and deliver a vehicle certificate. (*Id.*). Astornet also provided the airport police with a wireless device capable of authenticating certificates at any point within the airport. (*Id.*). As a result of this work, BWI vehicular gate security was dramatically increased and the system was able to efficiently handle and properly manage entry volume. (*Id.*).

      8.     On August 27, 2007, Astornet filed a patent application entitled "Airport Vehicular Gate Entry Access System" naming as its sole inventor "Michael A. Haddad." (Ex. 2 at 1).

      9.     On December 29, 2009, the United States Patent and Trademark Office (the "PTO") granted the '844 patent based on this application (*Id.* at 2), which claims as its invention: "An automated access control system for securing airport vehicular gates and airport sterile areas comprising:" a number of elements, including that "upon a credential reading, the . . . access control system automatically determines the source of the credential data record, and automatically extracts personal information to be checked against a security list, TSA NO-FLY list, SELECTEE list, other alternative credentials" and that the system further "upon the credential authentication, . . . automatically extracts authentication information from the authentication data record, and subsequently displays a warning window, as a result of the individual credentials match and ID forgery risks rating contained in the authentication data record." (*Id.* at col. 4, ll. 67 to col. 5, ll. 37).

      10.     The PTO Examiner noted that he was granting the '844 patent because none of the prior art considered by the Examiner "discloses" or provided any "reason or

3

motivation" that would render "obvious[]" the invention claimed in the '844 patent. (Ex. 3 at 5). Patents can only be granted by the PTO for new, useful and non-obvious inventions considered in light of the most relevant "prior art", or technical work that came before the work that is the subject of a patent application. *See, e.g.,* 35 USC § 102; 35 U.S.C. § 103. As the '844 patent itself notes, "[a]irport vehicular entry gates rely on human intervention and manual data entry and are prone to excessive error rates, lower security standards, increased inefficiencies and decreased reliability." (Ex. 2 at 1). Mr. Haddad improved upon BWI's systems markedly by "automatically" performing the steps claimed in the '844 patent, (*id.* at col. 4, ll. 67 to col. 5, ll. 37), something which had never been done before and was not at all "obvious[]" to one of ordinary skill in the art, (Ex. 3 at 5).

11.     One of the main difficulties of such a system, for example, was accurately comparing names of passengers that could be translated into English with many different spellings. As a well known example, the one time leader of Libya, Colonel Gaddafi, had his name spelled in newspapers in this form, but also one can find many examples of the same individual having his name spelled as Kadafi and Qaddafi as well. This is not unusual; there is no universally accepted authority for transliterating Arabic names. However, to a human being, all of the spellings of Gaddafi can be seen to be phonetically related. To a computer, by contrast, phoenetic relationships are very difficult to detect. Accordingly, one of the key improvements Astornet made to the state of the art in this area was to develop an arabic language phonetic comparison algorithm that in a number of cases was the difference between catching a match with the TSA no-fly list or not. Astornet's BWI system thus removed human security personnel from the equation but did

4

so without sacrificing accuracy on phonetic comparisons that can prove crucial to flagging a particular individual on the No Fly list.

12. In June 2009, seeking to build on its success with Astornet's BWI system, Astornet sought to provide its systems in response to TSA requests for bids from government contractors for improved security systems, in particular a system the TSA named the Credential Authentication Technology-Boarding Pass Scanning System (CAT/BPSS). After presenting the TSA with its CAT/BPSS proposal, Astornet was selected for testing and advanced to the next stage of the process. At that stage, the TSA required all of the CAT/BPSS bidders to provide 5 systems in kiosks at a demonstration facility, free of charge. This was a substantial burden on Astornet, as evidenced by the fact that the TSA ultimately purchased 10 systems with five months of support at the earliest stage of the CAT/BPSS program for $1.97 million, or approximately $200,000 a system. (Ex. 5 at 2). Accordingly, participating in this round required an outlay of nearly $1,000,000 in finished systems and support, with no commitment by the TSA to purchase anything.

13. Astornet accordingly attempted to participate in the demonstration with 5 systems in parts, and observed the competing systems being offered by defendant BAE. Unfortunately Astornet was unsuccessful with its bid for the initial CAT/BPSS contracts, at least in part owing to its failure to provide the requisite systems in a kiosk at this demonstration.

14. The CAT/BPSS contracts were instead ultimately awarded to, *inter alia*, defendant BAE. (Ex. 4). In September 2011, BAE was awarded a CAT/BPSS contract providing for orders totaling up to $79 million under its contract (Ex. 4 at A002), as well

as an initial order of 10 systems for approximately $2 million, including five months of support, for a pilot program totaling $6 million.  (Ex. 5 at 2).

15. Notwithstanding their success in obtaining the initial contracts, the initial pilot program with BAE and others did not go well, and in June 2012, the TSA decided to delay procurement of CAT/BPSS.  (Ex. 6 at 1).  The TSA conducted additional research on the matter in 2013, (Ex. 7 at 1), and re-solicited proposals for a slightly revised CAT/BPSS system, which proposals were due on January 21, 2014.  Astornet submitted a proposal for the revised CAT/BPSS system, as did others.  Counsel for BAE, Scott Felder, Esq., of Wiley Rein has represented to counsel for Astornet that BAE did not submit a proposal for a revised CAT/BPSS system, and did not provide original CAT/BPSS systems and support beyond the initial $2 million pilot program.[1]

16. Nevertheless, BAE's successful pursuit of the original CAT/BPSS system contract resulted in the performance of methods which infringe Astornet's '844 patent. BAE's manufacture, sale, and delivery of full and prototype CAT/BPSS systems to the TSA alone, however, did not result in infringement of Astornet's '844 patent.  The sole independent claim of the '844 patent, requires, *inter alia*, "one or more of the following processing" steps to be performed, which processing steps are not performed when BAE's CAT/BPSS system is simply being manufactured, sold, or delivered to the TSA. Instead, these steps are performed when the CAT/BPSS system is being used for its intended purpose to maintain security in sterile areas by, *inter alia*, checking boarding passes against passenger photo identifications and detecting fraudulent identifications.

---

[1]   The full extent of BAE's infringement will need to be explored through discovery, but at least in the current absence of any discovery, this is the apparent scope of BAE's infringement.

6

Accordingly, BAE infringed the '844 patent at least by inducing the TSA to use the BAE CAT/BPSS system for these purposes by providing the TSA both with CAT/BPSS prototypes and 10 full CAT/BPSS systems, and instructing the TSA regarding the use of these systems in a manner which infringes the '844 patent as explained in detail below.

**BAE Induced the TSA to Infringe Astornet's '844 Patent**

17. Claim 1 of the '844 patent first requires "An automated access control system for securing airport vehicular gates and airport sterile areas comprising; a standardized credential reader means for reading a credential encoded with personal identification . . . ." BAE's CAT/BPSS system meets this limitation by having a reader that can read a boarding pass, which is encoded with personal identification including the passenger's name.

18. Claim 1 next requires this system "be used at entry point into the airport sterile areas." BAE's CAT/BPSS system meets this limitation because this system was to be used on passengers, visitors and transportation workers before entering a sterile/secure area.

19. Claim 1 next requires this system to "automatically collect[] data to build individual real time records." BAE's CAT/BPSS system meets this limitation because this system was designed to scan boarding passes and build the data in real time. TSA specified that in fact no private data should be stored in the system to comply with the Private Individual Information Act.

20. Claim 1 next requires the system to have "a software application for recovering information from the standardized credential reader." BAE's CAT/BPSS

system meets this limitation because this system had such software applications; without such applications, BAE could not automate its system as required by CAT/BPSS.

21. Claim 1 next requires a system "wherein one or more of the following processing is performed: real time records are checked searching for a credential collected information match . . . ." BAE induced the TSA to infringe this limitation by instructing the TSA how to use BAE's CAT/BPSS system to check a passenger's boarding pass credential information against other credentials provided by the passenger such as a driver's license or a passport.

22. Claim 1 next requires a system wherein "admission is processed as entry or re-entry of the individuals." BAE's CAT/BPSS system meets this limitation during operation because BAE's systems did not store any personal information, so all admissions were processed "as entry . . . .of the individuals" as required.

23. Claim 1 next requires "an ID authenticator, wherein a credential to be authenticated is presented." BAE induced the TSA to infringe this limitation by instructing the TSA how to use BAE's CAT/BPSS system to check a passenger's boarding pass credential information against other credentials provided by the passenger such as a driver's license or a passport.

24. Claim 1 further requires that the system "analyze" a "credential physical aspect and embedded security features to determine the possibility of any tampering or forgery and provide an authenticity risk rating." BAE induced the TSA to infringe this limitation by instructing the TSA how to use BAE's CAT/BPSS system to detect forged identification, using the same commercial ID authenticator found in all of the prototypes submitted to TSA, which authenticator includes an authenticator database that has a

record of all state drivers license ID templates, including holographic features, small transparent pictures of the individuals that can only be seen in the infrared, and similar federal passport security features, all of which the authenticator analyzes to determine the validity of the identification and provide an authenticity risk rating.

25. Claim 1 further requires "said ID authenticator comprises means to read non-encoded credentials. . . ." BAE's CAT/BPSS system met this limitation because the commercial ID authenticator used by BAE is able to accept manual input of credential information on IDs that for whatever reason is non-machine readable, which was also a requirement of the CAT/BPSS specification.

26. Claim 1 further requires "said ID authenticator generates an authentication data record comprising presented credential information and authentication rating . . ." BAE induced the TSA to infringe this limitation by instructing the TSA how to use BAE's CAT/BPSS system to detect forged identification because the commercial ID authenticator found in all of the prototypes submitted to TSA generates an authentication data record which includes the presented credential information as well as an authentication rating.

27. Claim 1 further requires the system to have "a central processing unit for receiving information from the standardized credential reader and the ID authenticator." BAE's CAT/BPSS system met this limitation because without such a central processing unit, the system would not be automated as required by the CAT/BPSS specification.

28. Claim 1 further requires that "upon a credential reading, the automated access control system automatically determines the source of the credential data record, and automatically extracts personal information to be checked against a security list, TSA

9

No-Fly list, selectee list, other alternative credentials. . . ." BAE induced the TSA to infringe this limitation by instructing the TSA how to use BAE's CAT/BPSS system to automatically recognize a boarding pass and automatically extract the personal information from the boarding pass, and check it against "other alternative credentials," i.e. a driver's license or passport.

29. Claim 1 further requires that "upon the credential authentication, the automated access control system automatically extracts authentication information from the authentication data record and subsequently displays a warning window, as a result of the individual credentials match . . ." BAE induced the TSA to literally or equivalently infringe this limitation by instructing the TSA how to use BAE's CAT/BPSS system to detect forged identification or a credential match failure, because any such detected forgery or failed match would have needed to provide a clear alert to the operator both as a practical matter and as requirement of the CAT/BPSS specification.

30. Claim 1 finally requires there to be an "ID forgery risk rating contained in the authentication data record." BAE's CAT/BPSS system meets this limitation in operation because BAE's prototype uses the same commercial authenticator as Astornet's prototype, which produces a forgery risk rating in the authentication data record.

31. Accordingly, BAE induced infringement of Claim 1 of the '844 patent by the TSA and/or has committed acts of contributory infringement of the '844 patent.

**Count 1 – BAE's Infringement of the '844 Patent**

32. Astornet incorporates by reference the material factual allegations above.

33. BAE induced infringement of Claim 1 of the '844 patent by the TSA and/or has committed acts of contributory infringement of the '844 patent.

34. BAE's activities have been without express or implied license from Astornet.

35. As a result of the infringement of the '844 Patent, Astornet has been damaged and is entitled to be compensated for such damages, pursuant to 35 U.S.C. § 284, in an amount to be determined at trial.

## Jury Trial Demand

36. Astornet demands a trial by jury on all appropriate issues.

## Prayer for Relief

Therefore, upon final hearing or trial, plaintiff Astornet prays for the following relief:

(a) A judgment that BAE has infringed the '844 Patent;

(b) A judgment and order requiring BAE to pay damages to Astornet adequate to compensate it for BAE's wrongful infringing acts, in accordance with 35 U.S.C. § 284 and 35 U.S.C. § 289;

(c) A judgment and order requiring BAE to pay to Astornet pre-judgment interest under 35 U.S.C. § 284, and post-judgment interest under 28 U.S.C. § 1961, on all damages awarded; and

(d) Such other costs and further relief, to which Astornet is entitled.

Dated: February 25, 2014                     Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　 /s/ Geoffrey Mason, Esq.
　　　　　　　　　　　　　　　　　　　　　　　Geoffrey Mason, Esq., Bar No. 15772
　　　　　　　　　　　　　　　　　　　　　　　Moarbes, LLP
　　　　　　　　　　　　　　　　　　　　　　　2200 Pennsylvania Avenue, NW
　　　　　　　　　　　　　　　　　　　　　　　Fourth Floor, East
　　　　　　　　　　　　　　　　　　　　　　　Washington, D.C.  20037
　　　　　　　　　　　　　　　　　　　　　　　Direct: (202) 507-5720
　　　　　　　　　　　　　　　　　　　　　　　geoff.mason@moarbes.com